EFAW, Respondent, vs. INDUSTRIAL ·COMMISSION OF WIS-CONSIN and another, Appellants.

*September 12—November 5, 1929.*

138

For the appellant Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

For the appellant Great Northern Railway Company there was a brief by *Murphy, Hughes & Anderson* of Superior, and oral argument by *Mr. C. J. Hughes.*

For the respondent there was a brief by *Samuel A. Anderson* of St. Paul, Minn., and *Wilson & Wilson* of Superior, and oral argument by *Mr. Anderson.*

FRITZ, J. The learned circuit judge concluded that at the time of the plaintiff Efaw's injury he was engaged in work

which was so closely related to interstate commerce as to be practically a part of it, and, consequently, that plaintiff and his employer were not subject to the provisions of secs. 102.03 to 102.35, Stats., and it was beyond the jurisdiction of the Industrial Commission of Wisconsin to make an award for compensation. There is no conflict in the evidence as to plaintiff's work and duties when he was injured, but the facts established by the undisputed evidence present a troublesome question of law.

The Great Northern Railway Company operates an extensive system through several states. About twenty-five miles of main track, from the city of Superior to the Minnesota border, together with extensive terminal facilities at Superior, constitute the only portion of its system which is in Wisconsin. At Superior it had docks and facilities for unloading and storing coal, some of which, as needed, was loaded and transported on its cars and tracks to a storage track near a coal chute, for coaling its locomotives. Almost all of its locomotives and trains were used in interstate commerce. Thirty-five locomotives were used, indiscriminately in terminal switching operations, a small part of which was only intrastate in character. All of its locomotives at Superior, whether used in interstate or intrastate transportation, were coaled at its Superior chute at the completion of the day's work, and were then left in its roundhouse or on its storage tracks from eight to forty-eight hours before being assigned to any type of commerce.

Plaintiff, a laborer, was employed most of the time in repairing and cleaning the railway's structures and water system in the Superior terminal. Occasionally he had to help unload cars of coal into the coal chute, which was a building containing twenty receptacles or pockets. An incline sixty feet long extended upward thirty feet from the yard level to the top of the chute. A "load" track, upon

which each loaded coal car was placed to be unloaded into the chute, extended from the yard level up the incline and over the pockets. Fifteen feet up the incline there was a switch connecting an "empty" track with the "load" track, and designed to be thrown to let each car, when unloaded, off the "load" track and out of the way. An electric stationary engine and a cable, extending from the top of the chute, were used to hoist up the loaded cars and to lower the empty cars. From five to eight cars were spotted on the "load" track during each eight-hour shift, and from twelve to eighteen carloads were required each day to supply the locomotives. The total capacity of the twenty pockets was from twelve to sixteen cars, which was a sufficient supply for twelve to fourteen hours. The coal was unloaded from the loaded cars into the pockets for use of the locomotives as fast as they were brought up. A foreman had charge of the men who unloaded the coal, and he operated the electric hoisting engine and also opened the pockets for the locomotives as they were brought up for coaling.

On the day of the accident plaintiff and his crew had unloaded three of six loaded cars, each of which they had to haul up on the "load" track. The last of those three cars had "pick up" coal which had been spilled at the chute while locomotives were being unloaded, and which had been shoveled up from the ground into a gondola car, which had been left standing on a storage track for several days until a load accumulated. After that it had stood on another storage track for several days. "Pick up" coal was not used on passenger or road locomotives, but only on locomotives which were used for switching within the city of Superior. After unloading that third car, plaintiff started to walk down the incline to turn the switch to the empty track, so as to let that empty car out of the way and to assist in bringing up the next car, which was loaded with coal for general use. Before

reaching the switch, that empty car, which the foreman was letting down by means of the electric engine and the cable, overtook plaintiff and seriously injured him.

In determining whether the work in which Efaw was engaged when injured was so closely related to interstate transportation as to be a part of it, "we are only concerned with the nature of the work in which the plaintiff was employed at the time of his injury." *Pedersen v. D., L. & W. R. Co.* 229 U. S. 146, 151, 33 Sup. Ct. 648; *Erie R. Co. v. Collins,* 259 Fed. 172. Efaw sustained his injury while walking down the incline to turn the switch and clear the "load" track on the incline for another car loaded with coal which was for use of locomotives engaged in both types of transportation. In order to put the coal into the pockets, it had to be raised from the level of the storage track to the top of the chute. That could not be done merely with shovels in the hands of Efaw and his fellow workmen. Larger tools and facilities were necessary and were furnished to enable the employees to hoist up the coal to the height and in the quantity required to supply the locomotives. Raising the coal up the incline to the chute was the commencement of the operation of putting the coal into the pockets. Necessarily in furtherance thereof, and incidental to such raising up of the coal, were the acts of clearing the "load" track on the incline by throwing the switch for the empty car which was being lowered, and then attaching the cable to the next loaded car. All of those steps were essentially a part of the operation of putting the coal into the chute, and, in so far as they are part thereof, Efaw was assisting and engaged in unloading coal into the chute at the time of his injury.

On the other hand, the coal which he had helped unload just prior to his injury, with the exception of the one car of "pick up" coal, and the coal in the car for which he was clearing the "load" track, and which he was about to put

into the chute, was being unloaded for the supply of locomotives which were engaged principally in interstate commerce. All of Efaw's acts at and about the coal chute, including the incline, were, in point of time and purpose, so intimately related and necessary to the final purpose of unloading the coal into the pockets for the use of locomotives engaged in both types of commerce that they are not separable or distinguishable in legal character. As was said by the supreme court in *Erie R. Co. v. Szary*, 253 U. S. 86, 89, 40 Sup. Ct. 454, in relation to successive acts of service performed by employees:

"There were attempts there, and there are attempts here, to separate the duty and assign it character by intervals of time, and distinctions between the acts of service. Indeed, something is attempted to be made of an omission, or an asserted omission, in the evidence, of the kind of commerce in which the last engine served was engaged. The distinctions are too artificial for acceptance. The acts of service were too intimately related and too necessary for the final purpose to be distinguished in legal character."

The facts and circumstances which establish what work Efaw was actually engaged in when he was injured, considered in view of the decisions in *Graber v. D., S. S. & A. R. Co.* 159 Wis. 414, 150 N. W. 489; *Pedersen v. D., L. & W. R. Co.* 229 U. S. 146, 33 Sup. Ct. 648; *St. Louis, S. F. & T. R. Co. v. Seale*, 229 U. S. 156, 33 Sup. Ct. 651; *Erie R. Co. v. Collins*, 259 Fed. 172, affirmed in 253 U. S. 77, 40 Sup. Ct. 450; *Erie R. Co. v. Szary*, 259 Fed. 178, affirmed in 253 U. S. 86, 40 Sup. Ct. 454, necessitate the conclusion that when he was injured he was engaged in work which was so closely related to interstate commerce as to be a part of it.

An examination of those cases will disclose their significance and application to the facts in the case at bar. No useful purpose will be served by any extended review or discussion of those cases.

The decisions in *Chicago, B. & Q. R. Co. v. Harrington,* 241 U. S. 177, 36 Sup. Ct. 517, and *Lehigh Valley R. Co. v. Barlow,* 244 U. S. 183, 37 Sup. Ct. 515, may, on first impression, seem to warrant a different conclusion. In the two latter cases, members of switching crews were injured while switching cars containing coal belonging to their employers, from storage tracks, on which they had been standing for some time, to tracks at the coal chutes. Neither the injured employees, nor their respective switching crews, had anything to do with the unloading of the coal into the chutes. In each of those cases it was concluded that the mere removal of the loaded cars to storage tracks at the coal chutes, without any duty in relation to the unloading of the coal into the chutes, was not work so closely related to interstate transportation as to be a part of it. The controlling distinction between the work in which Efaw was engaged and that of the injured employees in the *Barlow* and *Harrington Cases* is that Efaw's duties included putting the coal into the chute. The significance of that distinguishing fact is demonstrated by the following pertinent statement in *Erie R. Co. v. Collins,* 259 Fed. 172, 175:

"At the time of his death Harrington was engaged in switching coal belonging to the railroad company, and which had been standing on a storage track for some time, to the coal shed, where it was to be placed in bins or chutes, from which it was to be supplied as needed to locomotives of all classes, whether used in interstate or intrastate traffic. . . .

"It [the coal] ceases to be in such commerce when it reaches its destination and is left on the storage tracks for some time, as in the *Harrington Case.* Then the coal, being out of interstate commerce, does not again get into interstate commerce by the mere act of being moved from the storage tracks to another place on the tracks in front of the coal chutes. That was the act Harrington performed. The coal was still to be unloaded into the chutes, and with that act Harrington was not engaged. In unloading the coal into the

chute, from which it was to be taken by the locomotives in interstate and intrastate commerce, it became converted into an instrumentality of interstate commerce. The act of putting the coal into the chutes from which the engines can take it is an act performed in interstate commerce, as much so as is the act of putting water into the trough by the side of the tracks to be scooped up by passing engines; and we cannot distinguish the act of putting the coal into the coal chutes for the supply of engines from the act of putting rails alongside of a track into which they are to be fitted or the bolts by the side of the bridge, as in the *Pedersen Case*."

In affirming that decision of the circuit court of appeals the supreme court said:

"It may be said, however, that this case is concerned exclusively with what was to be done, and was done, at the pump house. This may be true, but his duty there was performed and the instruments and facilities of it were kept in readiness for use and were used on both commerces as was demanded, and the test of the cases satisfied." *Erie R. Co. v. Collins*, 253 U. S. 77, 85, 40 Sup. Ct. 450.

For the reasons stated, Efaw, when injured, was engaged in work so closely related to interstate transportation as to be part of it, and therefore the Industrial Commission was in error in concluding that at the time of such injury he and his employer were subject to the provisions of secs. 102.03 to 102.35, Stats. The judgment setting aside and vacating the commission's award must be affirmed.

*By the Court.*—Judgment affirmed.