### ERIE R. CO. v. SZARY.*

(Circuit Court of Appeals, Second Circuit. February 3, 1919.)

No. 160.

COMMERCE ⚖⇒27(7)—FEDERAL EMPLOYERS' LIABILITY ACT—INJURY IN "INTERSTATE COMMERCE."

The employé of a railroad, whose work was to supply engines with sand, and who, after having carried ashes from the drying stove to the ash pit, lost his leg when struck by a locomotive on a foggy night, *held* injured in interstate commerce, so as to entitle him to maintain action under federal Employers' Liability Act (Comp. St. §§ 8657–8665).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

In Error to the District Court of the United States for the Southern District of New York.

Action by Antoni Szary against the Erie Railroad Company. To review a judgment for plaintiff, defendant brings error. Affirmed.

The action is brought under the federal Employers' Liability Act, being Act April 22, 1908, c. 149, 35 Stat. 65, amended by Act April 5, 1910, c. 143, 36 Stat. 291 (Comp. St. §§ 8657–8665). The defendant in error, who was plaintiff below, is hereinafter referred to as plaintiff. The plaintiff in error, defendant below, is hereinafter referred to as defendant.

The facts appear in the opinion.

---

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari granted 250 U. S. ——, 39 Sup. Ct. 490, 63 L. Ed. ——.

Stetson, Jennings & Russell, of New York City (William C. Cannon, R. L. von Bernuth, and Coulter D. Young, all of New York City, of counsel), for plaintiff in error.

John C. Robinson, for defendant in error.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

ROGERS, Circuit Judge. This is a personal injury case, in which the plaintiff has obtained a verdict for $20,000 for the loss of a leg, which resulted from injuries he received while employed by the defendant in its yards at Jersey City. The case has been brought to this court on the theory that the plaintiff was not at the time of his injury engaged in interstate commerce, and so was not entitled to maintain the action under the federal Employers' Liability Act.

It appears that plaintiff was employed as an engine sander. He prepared the sand to be used, and placed it in the engines that came into the defendant's yard and which needed it, whether such engines were engaged in interstate or intrastate commerce. An engine of ordinary size would carry about thirty pails of sand. This sand the engines had to use in order to go upgrade or over slippery tracks. In doing this work, two other men were associated with the plaintiff in his task. They did their work of preparing the sand in what is called "the sand house," a small structure standing in the yards and alongside the tracks. The sand was brought into the yard by cars every Sunday morning, and a Browning hoist lifted it from the cars into a sand bin. The plaintiff and his associates would get the sand from the bin into which it had been shoveled by a big steam shovel. The work consisted in drying the sand in four big stoves built for the purpose, and which were surrounded with what are described as "big covers," into which the sand is shoveled, and from which, as it dries, the sand gradually drops out onto the ground. The stoves are heated with soft coal, and it was in line with the plaintiff's general work to supply the coal to the stoves and to remove the ashes of the burned coal. These ashes he or his associates would take out of the stoves and carry some little distance from the sand house, to what was known as an ash pit, some 30 feet distant, where they were dumped, and to reach the ash pit it was necessary to cross some of the tracks.

On the night of the accident, January 5, 1917, the plaintiff began his usual work at 6 p. m., and put the sand into about seven engines, which he said were going to other states. He sanded the last engine that night at 9 o'clock and the accident happened half an hour thereafter. After sanding his last engine he took the ashes out of the stove and carried them over to the ash pit in a pail according to his custom, and in doing so had to cross one of the tracks. He dumped his pail and left it on the ground, while he went to the engine room to get a drink of water, and in doing so was compelled to cross a track; and, having obtained a drink, he started back to cross the track to get his pail, and in attempting to cross the track was hit by an engine. He had looked, but saw no engine, and heard no signal. The night

he described as "very dark and very foggy and rainy and misty." The plaintiff testified that at the time he could not see anything. The steam and smoke from the engines in all parts of the yard were so thick that he could see nothing. The engine that hit him was running backwards and without a light. He was picked up and carried to a hospital, and his left leg was amputated the same night, being removed from two to three inches below the knee.

The question presented is whether the plaintiff, at the time of his injury, was engaged in interstate commerce. It will be conceded, we suppose, that workmen engaged in bolting timbers into a bridge which is a part of the line of an interstate railroad are engaged in the work of interstate commerce; and if timbers have been delivered at the bridge, which the men are actually engaged in shortening, narrowing, and thinning to make them fit the places into which they are to be bolted, such preparatory acts so far partake of the character of the final act of bolting that, if an accident happens to the men while so employed, it should be held that they were at the time engaged in interstate commerce; and if, after the work of shortening, narrowing, and thinning is done, the men collect the rubbish they have made and remove it to a dump, that act is so connected and related to the other that, if they are injured while so engaged, they would be entitled, as it seems to the writer, to recover under the federal Employers' Liability Act. The writer is unable to distinguish such a case from the case now under consideration. The act of sanding the locomotives is an act done in interstate commerce. The act of drying the sand in the stoves, performed by the same man who sands the engines and in preparation for that act, is as much related to it and as much partakes of its character as does the act of preparing the timbers to be placed in the bridge; and the act of removing the ashes is not distinguishable from the act of removing the rubbish in the case above mentioned.

It appears that, after the plaintiff had dried the sand in the stove, he sieved it and took it out of the sand house, which was a diminutive structure, a small shed, and put it into bins in a little shed next to the sand house, from which he would take it during the day and night, when he filled the sand bin in the engines. To speak of sand in these bins as being in storage, when it was used up in 24 hours is a rather exaggerated use of the term. For each night the plaintiff had ready a new supply of the sand, and whether the sand, after being heated and sieved, was permitted to lie on the floor of the sand house, or for convenience was put in a bin in an adjoining shed, is a matter of no consequence. The amount of sand needed every 24 hours by the large number of engines coming into the defendant's yards at Jersey City was so great as to keep three men busy each day in providing it, and, as each day's demand exhausted each day's supply, to claim that the sand was in storage is wholly unwarranted and without significance.

In Guida v. Pennsylvania Railroad Co., 183 App. Div. 822, 171 N. Y. Supp. 285 (July, 1918), the Appellate Division of the Supreme Court of New York held that, where a railroad company maintained boilers at Long Island station, Long Island City, in the state of New York,

in which it produced steam necessary to operate electricity producing machinery, from which it supplied power to both intrastate and interstate trains, such boilers are indispensable instrumentalities of interstate commerce, and a common laborer, killed while removing soot from one of the boilers, was killed in interstate commerce, within the meaning of the federal Employers' Liability Act, and hence his representative was not entitled to an award under the Workmen's Compensation Law of the state of New York (Consol. Laws, c. 67). There were 36 boilers at the plant. Not all of the boilers were in use at any one time, but it was customary and necessary after a boiler had been in operation for 6 or 8 weeks to shut it down for the purpose of removing the soot from it and making needed repairs. At the time of the accident 12 of the 36 boilers had been temporarily withdrawn from service, in order that they might be freed from soot and repaired. The deceased was within one of the idle boilers, engaged in the regular course of his employment of removing soot from the boiler, when hot soot fell upon him and so badly burned him as to cause his death. The court held that the boiler plant was an instrumentality of commerce, along with the dynamos which generated the electric current, and the engines by means of which the current was made of service. The court added:

"The 12 boilers which were temporarily idle were an indispensable part of the boiler plant, as it was only by freeing them of soot, making the necessary repairs, which could be made only when the boilers had been temporarily withdrawn from active service, later substituting them for 12 boilers then in use, that the efficiency of the plant could be maintained, and the transportation system operated. Freeing the boilers of soot was as necessary to make them effective as making needed repairs. The deceased was therefore injured while engaged in restoring to efficiency one of the units of an indispensable instrumentality of interstate commerce. He was employed in interstate commerce equally with the employé who was carrying bolts with which to repair the bridge and the employé who was tamping the ties."

The case was carried to the New York Court of Appeals, which affirmed without opinion. 224 N. Y. 712, 121 N. E. 871 (November, 1918).

In Grybowski v. Erie Railroad Co., 88 N. J. Law, 1, 95 Atl. 764 (1915), the Supreme Court of New Jersey held that a person, employed by a railroad company in cleaning out an ash pit under a track into which locomotives employed in both interstate and intrastate commerce dumped ashes, was engaged in interstate commerce, as the keeping of the ash pit clean was required by both kinds of commerce, and that he was entitled to maintain an action under the federal Employers' Liability Act. Chief Justice Gummere, writing for the court, said:

"The proofs show that the ash pit was a part of the plant of the defendant company, that it was a necessary part of that plant, and that it was used both in interstate and intrastate commerce. The keeping of it clean, and thereby maintaining its effectiveness, was required equally for both kinds of commerce, just as the keeping in repair of tracks or bridges, which are used for both kinds of commerce, is a necessary incident to each of them."

The court thought the Pedersen Case, 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153, was controlling. The case

was carried to the Court of Errors and Appeals, and was affirmed (89 N. J. Law, 361, 98 Atl. 1085) upon the reasons stated in the opinion below; 12 judges voting for affirmance, and none for reversal.

I am unable to see how, if the cases cited were correctly decided, this court can hold that the plaintiff herein is not entitled to maintain this action. The stove in which the sand was dried was an instrumentality of interstate commerce and an essential part of defendant's plant, and no sufficient distinction favorable to the defendant can, in my opinion, be made between cleaning out the soot from the boilers in the New York case and the removal of the ashes from the ash pit into which they were dumped by engines used in interstate and intrastate commerce in the New Jersey case, on the one hand, and the removal in the instant case, on the other, of the ashes arising from the drying of the sand. The man who dried the sand was the very man who sanded the engines. The man who removed the soot from the boilers is not shown to have had any other connection with the direct operation of the trains, and the same may be said as to the man who removed the ashes from the ash pit.

My Associates agree that this case must be affirmed because in their opinion it is not distinguishable from the case of Erie Railroad v. Collins, 259 Fed. 172, —— C. C. A. ——, decided at this term, when the court was differently constituted, and which at this date is not yet reported. It is said that this case and the Collins Case are not distinguishable in principle from the Harrington Case, 241 U. S. 177, 36 Sup. Ct. 517, 60 L. Ed. 941. In the Collins Case this court expressed its understanding of that case, and it is not necessary to repeat now what was there said.

Judgment affirmed.

LEARNED HAND, District Judge (concurring). The case of Collins v. Erie Railroad Co. is in my judgment quite indistinguishable from the case at bar. It was argued earlier than this case, before a court differently organized, and was in fact decided earlier, though the decision had not been handed down. It seems to me that it should control here, and I agree to affirm upon its authority. As a matter of first impression, I confess I should have thought both cases within the doctrine of C., B. & Q. R. R. Co. v. Harrington, 241 U. S. 177, 36 Sup. Ct. 517, 60 L. Ed. 941.

HOUGH, Circuit Judge. I agree to affirmance for the reasons above stated. Judge HAND'S memorandum also sufficiently indicates the ground of my dissent in the Collins Case.