**MISSOURI–KANSAS–TEXAS R. CO. OF TEXAS v. BARNABY et al.**

No. 2416.

Court of Civil Appeals of Texas. Waco.

Dec. 10, 1942.

Rehearing Denied Dec. 31, 1942.

236

Naman, Howell & Boswell, of Waco, for appellant.

Bryan & Maxwell, Sam Darden, and Ed Burleson, all of Waco, and M. J. Howze, of Monahans, for appellees.

RICE, Chief Justice.

This is a suit for damages brought by the surviving widow, and other members of the family of C. L. Barnaby, against the Missouri-Kansas-Texas Railroad Company of Texas, because of the death of C. L. Barnaby while an employee of defendant. Mr. Barnaby had been in the service of the defendant on its Texas Central branch, in the capacity of locomotive engineer, for about thirty years. The tragedy occurred a few miles west of Walnut Springs, in McLennan county, Texas, on April 1, 1938, while Mr. Barnaby was at the throttle of his engine proceeding east with his freight train from DeLeon to Waco. As the engine entered the west end of the railroad bridge over East Bosque River, the left side of Mr. Barnaby's head came in violent contact with a beam of the bridge, resulting in his death within a few hours. He was never conscious after he was injured.

Because of the nature of the load carried by the train at the time of the accident, Mr. Barnaby was engaged in interstate commerce, and this cause is therefore governed by the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.

Plaintiffs pleaded, as independent grounds for recovery, two specific acts of the defendant, each of which they contend constituted negligence and a proximate cause of Mr. Barnaby's injury and consequent death. One ground of recovery was that the defendant had maintained the beam of the East Bosque bridge too close to the side window of the locomotive which the deceased was operating for him to perform his duties with reasonable safety to himself; the other was that the defendant had maintained its tracks in such a rough and uneven condition as to cause the engine which deceased was operating to sway from left to right as it passed onto the bridge at the time he was injured.

Defendant pleaded that Mr. Barnaby, at the time he was injured, was engaged in interstate commerce and, by reason thereof, his cause of action was governed by the Federal Employers' Liability Act; that the condition of the bridge, track and roadbed had been substantially the same for many years; that the deceased had been employed for thirty years and had continuously operated engines of various sizes over this and similar bridges on said line, including engines the size of the one he was operating at the time of the accident; that such conditions were open, obvious and manifest and the deceased assumed the risk incident thereto by virtue of his employment.

The court overruled defendant's motions for a peremptory instruction and submitted the case to a jury on special issues. The findings of the jury were favorable to plaintiffs; and, insofar as material here, were substantially as follows: (1) The defendant failed to maintain the beam of the East Bosque bridge at such distance from the side window of the engineer's cab of the locomotive being operated by Mr. Barnaby as to permit him to perform his duties as engineer with reasonable safety to himself; (2) that such failure was negligence, and a proximate cause of the injury and death of deceased; (3) that the tracks of the defendant were so rough and uneven as to cause the engine on which Mr. Barnaby was riding to sway from left to right as it passed onto the bridge; (4) that the fact that the tracks were in such condition was negligence, and a proximate cause of Mr. Barnaby's death; (5) that Mr. Barnaby did not know the distance from the beam of the bridge to the cab of the engine when entering on the bridge in question with an engine of the 700 class; (6) that the distance from the beam of the bridge to the cab of an engine of the 700 class was not so open and obvious that a person of ordinary prudence would have known of it; (7) that Mr. Barnaby did not know that the distance of the beam from the cab of his engine endangered his safety; (8) that the distance of the beam of the bridge from the cab of an engine of the 700 class was not so open and obvious that an ordinarily prudent person, under the existing facts and circumstances, would have appreciated that it endangered his safety; (9) that Mr. Barnaby, at the time and under the circumstances in evidence, did not know that the distance of the beam from the cab of his engine endangered his safety; (10) the distance of the beam of the bridge from the cab of an engine of the 700 class was not so open and obvious that an ordinarily prudent person, under the existing facts and circumstances, would have appreciated that it endangered his safety; (11) Mr. Barnaby did not know of the condition of the tracks and roadbed west of the bridge; (12) the condition of

the tracks and roadbed west of the bridge was not so open and obvious that a person of reasonable prudence, in the exercise of ordinary care, must have known of it; (13) Mr. Barnaby, at the time in question, did not know that the condition of the tracks and roadbed west of the bridge endangered his safety; (14) the condition of the tracks and roadbed west of the bridge was not so obvious that an ordinarily prudent person, under the existing facts and circumstances, would have appreciated that it endangered his safety; (15) the death of the deceased was not due to an unavoidable accident.

Based on the above findings, and others not herein set out because immaterial to this appeal, the court rendered judgment against defendant for the aggregate sum of $10,200, with interest and costs.

Defendant predicates the appeal on two points. It contends that the trial court was in error in rendering judgment against it because: (1) Under all the evidence Mr. Barnaby had assumed the risks created by the acts of negligence pleaded by plaintiffs and found by the jury to have been committed by the defendant; and (2) there was no evidence that any pleaded act of negligence of the defendant was a proximate cause of the death of the deceased.

Because of the defendant's assignments of error it becomes necessary to discuss the evidence adduced in the trial of this case.

Mr. Barnaby had been in the employ of appellant for approximately thirty years as a locomotive engineer on its Texas Central branch, and had been on the run from De-Leon to Bell Meade, a distance of 117 miles, for approximately three years prior to his death. At the time of the accident Mr. Barnaby's schedule required him to leave Bell Meade at midnight, arrive at De-Leon the next morning, and to leave the latter place the same morning, returning to Bell Meade that afternoon. During this three year period Mr. Barnaby usually drove an engine of the 700 class but occasionally an engine of the 500 class was put in use.

The bridge on which Mr. Barnaby was killed was built in 1908. According to the testimony of one witness it had a clearance of 14 feet 1 inch (another witness testified 14 feet 3 inches) between the end beams, and this clearance was never increased. At the time this bridge was built engines of the 107 and 108 class were being used; and they, according to one wit-

ness, "were very small." There was more clearance on the bridge in question between the end beams, when the small engines were used, than there was when larger engines were used, the clearance being much less with the 700 class engine than with the 107 class. While the clearance on this bridge was never increased after it was built, the size of the engines used over it became larger and larger until the 700 class engines were obtained, they being the largest of all. Engines of the 107 and 108 class weighed about 80 tons; engines of the 700 class weighed 287,500 pounds.

Between Walnut Springs and DeLeon, on Mr. Barnaby's run, there were ten overhead bridges; the minimum distance of clearance inside of each of the ten bridges was measured by a witness, who testified that this clearance on four of the bridges was 14 feet; on two it was 15 feet; on three 15 feet 1 inch; and on the remaining bridge (the one on which Mr. Barnaby was killed) the clearance was 14 feet 1 inch.

The same witness testified that he had measured two engines of the 700 class from the outside of the cab window directly across to the opposite window of the other side; that on engine No. 768 the measurement was 11 feet 3½ inches from outside to outside; that engine No. 747 (the one on which Mr. Barnaby was killed) measured 11 feet 6 inches from outside to outside; that it is between 9 and 10 feet from the ground to the base of the side window on engine No. 747.

It was in evidence that at the west end of the bridge in question, the outside of the rail on the engineer's side of the cab (with the engine proceeding east) was one and one-half inches closer to the inside of the bridge beam than it was from the outside of the rail to the beam on the fireman's side.

There was testimony that after Mr. Barnaby was injured, splatters of blood were seen on the cross-ties and on a beam at the west end of the bridge in question; that the track west of the bridge was in very bad condition; that some of the cross-ties were missing, a lot of them were very irregular, some were broken—some of them were beneath the ground—others extended upward—there were rotten cross-ties, split cross-ties, and some cross-ties were broken clear in two, with the rails on the ground; there were spikes which were quite often not attached to the rails; some of these

spikes were turned around, some not there at all. There were some places where the rails would come together and there would be over-lapping of the rails. There would be three or four perfectly smooth rails and then there would be a drop; the fish-plates were loose. The track was washed considerably and was very rough; there were low places in the track; the rails had dips in them; west of the bridge there were a series of cracks and dips in the steel; about 10 feet west of the bridge on the right side there was a distinct dip, visible to the naked eye; about 15 or 20 feet on the left side there was another, and another back about 20 feet from the bridge.

The speed limit on Mr. Barnaby's run was thirty miles per hour; this limit was put into effect in 1937; prior to that it was twenty-five miles per hour; and at one time it had been twenty miles per hour. It was in evidence that an engine of the 700 class traveling at a speed of thirty miles per hour will swing from left to right; that on a rough or uneven track there is more swing than there will be on the same engine traveling on a smooth track at the same speed; that the worse the track, the more the sway of the engine; that when an engine hits a low joint, if it is low enough, it sways in the direction of the low joint, and if there is a low joint in the opposite rail, when it hits that it sways in the other direction, so that the engine rocks as it proceeds down the rails.

The evidence discloses that there is a curve to the west of East Bosque bridge; that if the fireman was down in the cab as the train approached this bridge it would be Mr. Barnaby's duty to look back and see if the train was coming around the curve; that there is nothing unusual about an engineer's sticking his head out of the window of his cab and looking back; that it is the common and accepted practice among railroad engineers when they look back to stick their heads out of the side window and see if the train is coming; that if a noise develops in his train it is the duty of the engineer to find the noise.

Several witnesses testified that their attention was attracted by the distress whistle of the locomotive, and that they were present when the train stopped at Walnut Springs after the accident; that they heard Mr. Capps, the fireman, who was on the engine with Mr. Barnaby at the time he was injured, say, in effect, that something went wrong with the train or engine and Mr. Barnaby stuck his head out of the window and the bridge hit him. The fireman denied making this statement, and testified he did not see Mr. Barnaby when he was injured; that what he said was that Mr. Barnaby must have stuck his head out and the bridge hit him; that he noticed nothing unusual in the movement of the train before it passed over the East Bosque bridge. The fireman testified that "as we entered that bridge" he left his seat to the left of and within a few feet of the engineer, and got down on the deck of the cab to get a pot of coffee. He then asked Mr. Barnaby if he was ready for his coffee. The latter replied by asking if it was Ab Appleby coffee. This was a joke among the crew as Mr. Appleby, the head brakeman, drank his coffee strong and black. Just before the accident and when the fireman last saw him, Mr. Barnaby was sitting up straight in his seat, which was adjusted to the low position so that Mr. Barnaby, who was short-legged, could have his feet on the floor. He had his elbow on the arm-rest of the cab. While thus seated he was on the right-hand side of the cab and above the fireman; and the latter was sufficiently close so that he could have touched the engineer. The firebox of the engine was situate below, just in front of, and between the seats for the fireman and engineer. These seats are five or six feet apart. The fireman, during this conversation, had "stooped over" in front of the firebox to pick up the coffee pot. While in this position, he replied that it was "Appleby" coffee. He then poured a cup for Mr. Barnaby, started to hand it to him and saw Mr. Barnaby was on his seat box with his head lying over the arm-rest. He then stood up, reached around Mr. Barnaby, and held him in place. He did not lay him down because there was no place to do so. His head was "caved in", his brains coming out of the hole. The fireman blew the whistle for the head brakeman to come to the cab, and the train proceeded to Walnut Springs, where Mr. Barnaby was removed. This witness further testified that on this line, and at the speed they were running, it was usual for the engines to sway some; that if there is a low place in the track which causes the train to sway, the engineer, from his position in the cab, can see it if it is "real bad"; that a broken tie could not be detected from the engine; that he had never noticed prior to the accident any unusual swaying at the bridge in question. There was evidence that the heavy

engine, being taller, would sway more than the lighter engine; that the former class would sway at least as much as 4 inches. The brakeman testified that he was seated in his dog-house on the tender when he heard the distress whistle of the engine made by the fireman after Mr. Barnaby was injured; that the train was just clearing the East Bosque bridge. It was in evidence that there were twenty cars and caboose in the train. The East Bosque bridge was 120 feet long.

All of the members of the train crew (except one who did not testify at all) testified that the train, as it approached the East Bosque bridge, just prior to the accident, was proceeding at a speed of thirty miles per hour, thirty miles being the maximum speed limit for this branch at that time; that they noticed no unusual roughness in the manner in which the train rode, and observed no unusual noise about the train; that they had no train trouble that day, that no repairs were made either to the engine or the cars while waiting in Walnut Springs, and the train proceeded thence to Waco without any indication that anything was mechanically wrong.

The evidence was undisputed that Mr. Barnaby was an experienced and careful engineer, and had worked over this road for about thirty years; that for several years he had driven engines of the 700 class over the bridge where the accident happened; that he had often used engine No. 747, the one he was driving when he was fatally injured. There was evidence that the distance from the outside of the engineer's cab window in engine No. 747 to the bridge beam in question was about 15 inches; that sunshades extending 9 or 10 inches out over the engineer's head were regularly used on the 700 class engines passing over this and the other bridges on this run, and none of defendant's witnesses had ever known of any of these shades coming in contact with any of the bridges. The witnesses did not observe whether Mr. Barnaby's sunshade was up or down at the time of the accident. At the bridge where the accident happened the track is straight and continues straight for some distance west of the bridge where it curves; that as a train approached this bridge from the west, the inside of the curve was on the fireman's side of the engine and not on the side of the engineer. The fireman testified that it is unnecessary for the engineer or fireman to stick his head out of his cab more than 3, 4 or 5 inches in order to look back at his train, and that this can be done while the engineer or fireman is sitting in his seat; that it would have been necessary for Mr. Barnaby to have stood up on his feet in order to lean his head out of his cab window as much as 15 inches because the arm-rest would prevent him from sticking his head out more than 5 or 6 inches while seated. Two members of the train crew testified that there was no specific rule or instruction that would require Mr. Barnaby to stick his head out of his cab window just as the engine entered the bridge, and they knew of no reason for Mr. Barnaby doing so on this occasion. There was testimony that the condition of the tracks and roadbed west of the East Bosque bridge had been substantially the same for a period of several years, except that some 6 or 8 months prior to the accident the bridge had been re-decked by placing new ties under the rails, and the approaches to the bridge had been re-worked in order to raise the rails to a level corresponding with the re-decked bridge. There was also evidence that the condition of the roadbed and bridge was open and obvious to anyone going over the line.

In reference to the doctrine of assumed risk invoked by the defendant, the rule is clearly stated in the often cited case of Gila Valley Railway Co. v. Hall, 232 U.S. 94, 34 S.Ct. 229, 231, 58 L.Ed. 521, as follows: "An employee assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employee has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employee with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew that it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person, under the circum-

stances, would have appreciated it." To the same effect are Chesapeake & O. R. Co. v. Profitt, 241 U.S. 462, 36 S.Ct. 620, 60 L.Ed. 1102; Chesapeake & O. R. Co. v. De Atley, 241 U.S. 310, 36 S.Ct. 564, 60 L.Ed. 1016; Chicago & N. W. R. Co. v. Bower, 241 U.S. 470, 36 S.Ct. 624, 60 L. Ed. 1107; Chicago R. I. & P. Ry. Co. v. Ward, 252 U.S. 18, 40 S.Ct. 275, 64 L.Ed. 430.

■■ When the sufficiency of the evidence is challenged, the further rule is applicable that the evidence and all legitimate inferences therefrom must be considered in its most favorable aspect in support of the judgment, excluding all unfavorable and contradictory evidence. Where the risk alleged to have been assumed arises from the negligence of the appellant master, the burden of proof to establish the assumption of such risk on the part of the employee is upon the appellant. Kanawha Ry. Co. v. Kerse, 239 U.S. 576, 36 S.Ct. 174, 60 L.Ed. 448; Delaware Ry. Co. v. Busse, 2 Cir., 263 F. 516; Baltimore Ry. Co. v. Taylor, 4 Cir., 186 F. 828.

■ And where the facts are controverted, or such that different inferences may be drawn therefrom, the question as to assumption of risk should be submitted to the jury. Kanawha Ry. Co. v. Kerse, supra; Seaboard Airline Ry. v. Koennecke, 239 U.S. 352, 36 S.Ct. 126, 60 L.Ed. 324; McGovern v. Philadelphia Ry. Co., 235 U. S. 389, 35 S.Ct. 127, 59 L.Ed. 283; Northern Pacific Ry. Co. v. Lundberg, 9 Cir., 176 F. 847; Texas Railway Co. v. Behymer, 189 U.S. 468, 23 S.Ct. 622, 47 L.Ed. 905.

■■ It is only where the evidence is harmonious and consistent and the circumstances permit of but one conclusion that the question of assumed risk becomes one of law for the determination of the court. Kanawha Ry. Co. v. Kerse, supra. The applicable rule has been stated in Butler v. Frazee, 211 U.S. 459, 29 S.Ct. 136, 138, 53 L.Ed. 281, as follows: "Where the elements and combination out of which the danger arises are visible it cannot always be said that the danger itself is so apparent that the employee must be held, as matter of law, to understand, appreciate, and assume the risk of it. Texas & P. R. Co. v. Swearingen, 196 U.S. 51, 25 S.Ct. 164, 49 L.Ed. 382; Fitzgerald v. Connecticut River Paper Co., 155 Mass. 155, 29 N.E. 464, 31 Am.St.Rep. 537. The visible conditions may have been of recent origin, and the danger arising from them may have been obscure. In such cases, and perhaps others that could be stated, the question of the assumption of the risk is plainly for the jury."

There is no direct evidence that Mr. Barnaby knew: The clearance of the bridge over the East Bosque River, or that the clearance of the bridges on his run varied as much as 13 inches; or that the clearance on the East Bosque bridge on his side as he proceeded east was an inch and one-half less than it was when going in the opposite direction; or the condition of the track west of said bridge or that the engines of the 700 class which he was required to operate varied in width as much as 2 and ½ inches; or the extent of the sway of his engine from left to right as it proceeded over the rails, especially at or near the west end of the bridge in question.

It may be conceded that Mr. Barnaby did know that if he stuck his head too far out of his cab as he passed through the bridges on his run that he would be subjecting himself to danger. But what was too far? Was the danger constant, or did the safety factors vary from bridge to bridge, changing not only with the amount of clearance of each bridge but with the width of the engine then being operated, and with the condition of the track at or near each bridge because of the engine's sway from side to side thereby caused?

The danger of entering East Bosque bridge was due, of course, to the lack of clearance between the end beams of the bridge and the engine being operated over it. There was evidence that the distance from the engineer's side of the cab of the engine in question to the inside of the end beam was approximately 15 inches when the engine was stationary. This distance, however, was not constant but varied with the state of repair of the rails and roadbed entering the bridge, because such state of repair influenced the amount of sway of the engine from side to side as it traversed the rails. There was evidence that the tracks of the defendant immediately west of the bridge in question were in a bad state of repair, and that this condition would cause an engine proceeding over them to sway; that the worse the condition of repair the more the sway. There was evidence also that an engineer, seated in his cab, driving his engine, could not see a broken tie nor a low joint unless the

latter were very bad. There is no evidence that Mr. Barnaby ever stopped his engine on this stretch of track, or inspected the same, nor was it his duty so to do.

This lack of clearance was contributed to by two factors. The first was that while the bridge was originally designed to accommodate a small and narrow type of engine, it was, without being increased in width, required to carry substantially larger and wider engines of the class operated by deceased when he was injured, thereby materially decreasing the original margin of safety provided by appellant for the operatives of its trains. The second contributing factor was the bad state of repair of the appellant's track and roadbed which caused the engines traversing the same to sway from side to side, thereby, to the extent of such sway, decreasing the remaining clearance and to such extent further infringing on what remained of the above mentioned original safety factor. Thus we have two found acts of negligence, that is, the too narrow bridge and the bad state of repair of the roadbed, each contributing to the death of the deceased, and each adding to the peril produced by the other. It could well be that the too narrow clearance of the bridge, or the bad state of repair of the track, each standing alone, and in the absence of the other, would not have endangered the safety of deceased; but yet the combination of the two perils, each materially adding to the danger produced by the other, could and would produce a situation that was not open or obvious, yet was highly dangerous to the operatives of appellant's trains.

The burden of proof was upon the defendant to establish its defense of assumed risk; and it is the duty of this court, in reference to the point under consideration, to consider the evidence and all reasonable inferences therefrom in its most favorable aspect to the appellees, excluding all unfavorable evidence. It is also the rule that when the facts are controverted or such that different inferences may be drawn therefrom, the question of assumed risk must be submitted to the jury. In view of the foregoing rules, and from the evidence before us, can it be said that this is such a clear case that reasonable minds cannot differ as to its controlling facts, and therefore as a matter of law it must be held that Mr. Barnaby is presumed to have known not only of the negligent acts charged to have been committed, but also that the same endangered his safety; or that such danger was so obvious that an ordinarily prudent person, under the circumstances, would have appreciated it? We think not. On the contrary, we are of the opinion that there is evidence to support each of the answers of the jury to the issues bearing on the question of assumed risk.

We next consider appellant's point that there was no evidence that any pleaded act of negligence of the defendant was a proximate cause of the death of deceased.

It is undisputed that immediately prior to the accident Mr. Barnaby, in the discharge of his usual duties, was sitting in his accustomed place on the right-hand side of the cab, with his seat adjusted in the low position so that his feet might touch the floor, and that his elbow was resting on the arm-rest of the cab; that the fireman was then standing on the floor of the cab, below the engineer, but so close to the latter that he could have touched him; that in the brief time that it took the fireman to stoop over and pour a cup of coffee and to start to hand it up to the engineer, the latter had received his fatal injury and had slumped down in his seat, unconscious.

It is true that the fireman denied that he saw Mr. Barnaby when he received his injury. However, three apparently disinterested witnesses testified that within a short time after Mr. Barnaby was injured, the fireman, in reply to an inquiry as to how the accident occurred, made a statement. According to one of the witnesses he said: "That he (Mr. Barnaby) heard some noise and he stuck his head out and the bridge struck him." According to another, the fireman stated: "Something went wrong with the train, or the engine, and he stuck his head out of the engine and it hit him, that the bridge hit him." According to the third witness' version of the statement, the fireman said on this occasion: "Mr. Barnaby had looked back to see about his train, something had gone wrong and he looked back, and the bridge hit him on the head. * * *." The fireman denied making any statement on said occasion except to the witness Hurley. As to the statement made to Hurley the fireman testified: "Well, he asked me what happened, and I told him it couldn't have been nothing else but he

hit his head on that bridge back there; it was bound to have been, he had his head out."

It is undisputed that Mr. Barnaby's death was caused by the left side of his head coming in contact with the bridge beam. At the time of the accident he was, therefore, either looking down or towards the rear of his train. Immediately before the accident he was seated with his elbow on the arm-rest; immediately after the accident his head was lying over the same arm-rest where his elbow had just been. No portion of his body was hanging out of the cab window, all of it was within the cab. The fireman, within a few minutes after the accident, if three disinterested witnesses are to be believed, stated that Mr. Barnaby stuck his head out, and the bridge hit him. In our opinion, the jury had the right to disregard the testimony of the fireman on the trial and to accept as true the evidence in respect to the statement of the fireman made shortly after the accident and to conclude therefrom that he saw Mr. Barnaby at the time he was injured, and that the latter had stuck his head out of the window of the cab in the discharge of his duties. This is especially true in view of the fireman's version of his statement that the bridge must have hit Mr. Barnaby, "he had his head out." The jury had the further right to conclude therefrom that his head was the only part of his body which Mr. Barnaby stuck out of the window, because, according to the witnesses, this is what the fireman stated while still laboring under the excitement caused by the accident. The jury had the right to conclude, we think, that if Mr. Barnaby had done the unusual, and had risen to his feet and leaned over the arm-rest to protrude his body through the window, thereby causing his injury, the fireman, under the stress of the excitement, would have so said, and not simply that Mr. Barnaby stuck his head out and the bridge hit him.

If the jury had the right thus to conclude, then we have, at the time of the accident, Mr. Barnaby seated in his usual position, with his head stuck out the window of the cab at a distance not to exceed 6 inches, because the fireman testified that this was as far as he could stick it out without getting to his feet and leaning over the arm-rest. The bridge and its beam remained stationary. What closed the intervening gap between Mr. Barnaby's head and the beam which killed him? There being no testimony as to how far such an engine as he was operating could sway; there being testimony that it could sway at least 4 inches; the testimony being that the worse the state of the repair of the track and the roadbed the greater the sway; and the jury being warranted in believing that the state of repair of the track at and near the west·end of the bridge was very bad, did not the jury have the right to conclude that the negligence of appellant in not providing sufficient clearance and in allowing its track to be in this state of disrepair caused the engine to sway sufficiently to cover the intervening gap, which was originally Mr. Barnaby's margin of safety, and thereby cause his head to come in violent contact with the bridge? We think that the jury had the right to so conclude, and that there was evidence to support the findings of the jury in respect to proximate cause.

Defendant's assignments of error are therefore overruled, and the judgment of the trial court is affirmed.

TIREY, Justice.

The majority opinion fully states the facts and the law questions involved.

My view is that under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., Mr. Barnaby assumed the risk of injuries resulting both from the width of the bridge and the condition of the track and roadbed, and that there was no evidence that the condition of the track and roadbed was a proximate cause of the injuries and death of Mr. Barnaby. I do not believe that the question of assumed risk became a fact issue to be submitted to the jury in this case under the rule announced by the Supreme Court of the United States in Gila Valley, G. & N. R. Co. v. Hall, 232 U.S. 94, 34 S.Ct. 229, 231, 58 L.Ed. 521.

In that case we find that the plaintiff was a chainman engaged with another employee in measuring distance for locating mile posts along the line of the railway for the purpose of transportation. They used a three-wheeled gasoline car furnished by the Company. The ground relied upon to support a recovery of damages from the employer was that the flange upon the three-wheeled car was worn and cracked in a manner that rendered its use dangerous; that the defect was of such character that it would have been discovered in the course of reasonable inspection, and, by reason of

such defect, the machine left the track and Hall sustained the injuries complained of. The judgment was assailed on the ground that the court erred in failing to grant motion for instructed verdict upon the ground that the alleged defect was so obvious that its existence must have been known to the plaintiff and that he therefore assumed the risk. The court said: "There was no direct evidence that he knew of the defect, and it does not appear to have been a part of his duties to inspect the machine or the wheel, or to look after their condition. He had been employed for only three or four days in work that required him to ride upon the car, and at the utmost it was a question for the jury whether the defective condition of the wheel was so patent that he should be presumed to have known of it. And then, the question whether the defect was such as to render the use of the car dangerous was in dispute at the trial; hence, it could not be properly held that the risk was indisputably obvious, even to one who knew of the defect. It is quite clear, therefore, that a verdict could not properly have been directed in favor of the defendant upon the ground that the plaintiff, in using the car, had assumed an obvious risk."

Now if we apply the rules of law announced in the Gila case to the undisputed facts in the Barnaby case, I am of the opinion that reasonable minds cannot differ in the conclusions reached. First of all, the long experience that Mr. Barnaby had had as an engineer and his knowledge, observation and use of the engines and roadbed and the bridges on the portion of the railroad in question are without dispute. That he did not observe the nearness of the bridge beams to the cab of his engine and appreciate the dangers thereof is contrary to all human experience; that the clearance inside of each overhead bridge varied from fifteen feet and one inch to fourteen feet and that the different sizes of engines operated by him also varied in width, and, by reason thereof, necessarily increased or decreased the clearance accordingly between the cab window and the inside beams of the bridges, in my opinion does not change the fact situation of the risk incident to such employment, but rather tends to emphasize the appreciation of the danger incident to such risk by a man of long experience, competent to operate a locomotive engine, whose duties necessarily made him observant of the bridges, track and roadbed and the equipment used by him in the performance of his duties, and of the dangers to himself as well as to the other employees engaged in the operation of the train.

My view is that when the facts of the Gila case are carefully analyzed and compared with the facts in the Barnaby case, the principle of law there announced does not make the question of assumed risk in the Barnaby case a fact issue. This view is based on the fact that in the Gila case, plaintiff had been employed for only three or four days in the work he was doing at the time he received his injuries. Mr. Barnaby's length of employment and the nature and extent of the observation required of him in the performance of his duties were quite different to that of plaintiff in the Gila case. Therefore, I cannot bring myself to the conclusion that Barnaby did not know and appreciate the dangers incident to the nearness of the track to the beams of the bridges, or the nearness of the beams of the bridges to his cab window. Nor do I think that it can be contended that he did not know and appreciate the fact that the engine he operated would sway from the right to the left and that the extent of such swaying would depend upon the speed of the train and the unevenness of the track. Reasonable minds cannot differ on these undisputed facts, and my view is that this case falls within the rule announced by the Supreme Court in Butler v. Frazee, 211 U.S. 459, 29 S.Ct. 136, 138, 53 L.Ed. 281, where the court said: "But where the conditions are constant and of long standing, and the danger is one that is suggested by the common knowledge which all possess, and both the conditions and the dangers are obvious to the common understanding, and the employee is of full age, intelligence, and adequate experience, and all these elements of the problem appear without contradiction, from the plaintiff's own evidence, the question becomes one of law for the decision of the court." See, also, Southern Pacific Co. v. Berkshire, 254 U.S. 415, 41 S.Ct. 162, 65 L.Ed. 335; Chesapeake & Ohio Ry. Co. v. Leitch, 276 U.S. 429, 48 S.Ct. 336, 72 L.Ed. 638; Jacobs v. Southern Railroad Co., 241 U.S. 229, 36 S.Ct. 588, 60 L.Ed. 970; Toledo, St. Louis & Western R. Co. v. Allen, 276 U.S. 165, 48 S.Ct. 215, 72 L. Ed. 513.

Are the circumstances and proof attending this accident sufficient to support an inference that the negligence of the de-

fendant in the maintenance of its track proximately caused the injuries resulting in the death of Mr. Barnaby? I think not. The exact manner in which Mr. Barnaby received the injuries resulting in his death is wholly circumstantial. "Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed. No presumption can be drawn from a presumption. If there be no fixed or ascertained fact from which the inference of another fact may be drawn, the law permits none to be drawn from it." Parks v. St. Louis S. W. Ry. Co., 29 Tex.Civ.App. 551, 69 S.W. 125, point page 127. See, also, Shifflet v. St. Louis S. W. Ry. Co., 18 Tex.Civ.App. 57, 44 S.W. 918; Missouri Pac. Ry. Co. v. Porter, 73 Tex. 304, 11 S.W. 324. The evidence adduced as to the manner in which Mr. Barnaby received his injuries is fully stated in the majority opinion. My view of the testimony is that it fails to show that the swaying of the engine was the proximate cause of the accident and injuries to Mr. Barnaby. Because the facts and circumstances in evidence wholly fail to explain the manner in which the accident to Mr. Barnaby occurred, I do not think the jury was authorized to infer and presume that the condition of the railroad track was such that it caused the engine to sway to the extent that Mr. Barnaby's head was caused to strike the beam of the bridge. I think the evidence as to the condition of the roadbed was such that the jury was warranted in the inference that the engine in question did sway in passing over the track at the place in question, but there is no evidence in the record as to the extent the engine swayed, or that it swayed for such distance that it caused Mr. Barnaby's head to strike the beam of the bridge, nor that the engine swayed more on the day of the accident than it had swayed on previous trips made by Mr. Barnaby. Since there is no evidence that the engine swayed more on the day of the accident than it had on previous trips, can it be said as a matter of law that Mr. Barnaby assumed the risk incident to such swaying on the day of the accident? I think so. Any other conclusion requires one to presume that the engine did sway more on the day of the accident than it had on previous trips, and that it swayed for such distance as to cause Mr. Barnaby's head to strike the beam of the bridge, and thereby results in pyramiding one presumption upon another presumption.

Since there is no evidence that the swaying of the engine caused Mr. Barnaby's head to strike the beam of the bridge, my view is that the jury was unauthorized to find that the negligence of the defendant in allowing its track to be in a state of disrepair was a proximate cause of the accident to Barnaby. "This fact of causal connection between an alleged negligent act or omission and an injury can no more be presumed than can the act or omission itself." Texas & Pac. Ry. Co. v. Shoemaker, 98 Tex. 451, 84 S.W. 1049, 1052. "Proximate cause cannot be presumed from the mere happening of the accident, but, like any other essential element, must be established in some manner, either by direct or circumstantial evidence." Webester v. Henwood, Tex.Civ.App., 134 S.W.2d 333, 334, writ refused; see, also, Tye v. Henwood, 153 S.W.2d 184, writ refused W.O.M.